Walter Bachrach v. Commissioner. Richard Uhlmann v. Commissioner. Alice U. Benjamin v. Commissioner.
Bachrach v. Commissioner
Docket Nos. 17025, 17083, 17084.
United States Tax Court
1949 Tax Ct. Memo LEXIS 212; 8 T.C.M. (CCH) 373; T.C.M. (RIA) 49092; April 22, 1949
*212 Morris Solomon, Esq., 231 So. La Salle St., Chicago, Ill., for the petitioners. Jackson L. Boughner, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion KERN, Judge: In these consolidated proceedings, respondent determined deficiencies in income tax of petitioners for the year 1944, as follows: Docket No.
Petitioner
Deficiency
17025
Walter Bachrach
$155.01
17083
Richard Uhlmann
489.55
17084
Alice U. Benjamin
603.58 The deficiencies result from respondent's action in disallowing deductions claimed by petitioners, representing 50 per cent of losses said to have been sustained on the sale of Certificates of Indebtedness of the Standard Club in 1944, and the inclusion by respondent of 50 per cent of the sums received as long-term capital gains. It is the position of the respondent that the certificates were worthless upon their receipt in 1937 when petitioners exchanged second mortgage leasehold bonds of the Standard Club which they owned for such certificates as part of the 77B reorganization of the Standard Club commenced in 1934, and, consequently, petitioners made a "surrender" of rights rather than an exchange of *213 securities under section 112 (b) (3). He also maintains that these bonds were worthless in 1934, and therefore petitioners' basis as to the certificates was zero when they were acquired. The first issue is whether the exchange of the bonds for the certificates, under the facts presented in these proceedings, constituted a "tax-free" reorganization, as defined in section 112 (g) of the 1936 Revenue Act, with a resultant non-recognition of gain or loss under section 112 (b) (3), and a consequent carrying over to the certificates of petitioners' basis as to the bonds, under section 113 (a) (6); and, secondly, whether the second mortgage leasehold bonds were worthless in 1934, the certificates of indebtedness issued therefor thereby having a basis of zero for the purposes of determining gain or loss. [The Facts] All of the facts have been stipulated and are hereby found accordingly. Only so much of the facts as are necessary to understand the problems involved will be recited. For the year 1944, petitioners, who were individuals residing in Chicago, Illinois, filed their income tax returns for the year involved with the collector for the first district of Illinois. Walter *214 Bachrach acquired one $500 Standard Club second mortgage leasehold bond in 1928 at face value. Richard Uhlmann acquired two $1,000 bonds in 1927 at face value; and Alice U. Benjamin acquired six such bonds in the same year at face value. The bonds were issued by the Standard Club, a non-profit Illinois corporation which operated as a private club for its members. Its principal asset consisted of a spacious 10-story club building erected in 1925 upon property leased by the Club under three long-term leases. In 1925 the Club issued $1,000,000 of first mortgage leasehold bonds, and in 1927 it issued $1,000,000 of second mortgage leasehold bonds. The funds received from the sale of these bonds, together with initiation fees, were used in erecting the building and for furnishings and fixtures. The cost of the building was carried on its books at time of acquisition at $2,639,080.34, and the equipment and fixtures were carried at $314,850.25. In 1934 the reproduction cost of the club building, after deducting ordinary age depreciation, was $1,420,920. In 1934 the Club was in default with respect to the payment of rentals under the leases in the amount of $113,650. It was also delinquent *215 in the payment of real estate taxes, including interest and penalties, of $100,000. There was also due on the first mortgage leasehold bonds the principal sum of $782,000 and matured interest of $109,740; and on the second mortgage leasehold bonds the principal sum of $1,000,000, and interest coupons of $125,000. Its other liabilities approximated $39,000. At the time it was possessed of its building, and furniture and fixtures, and current assets of approximately $100,000. Its balance sheet as of March 31, 1934, revealed assets totalling $3,130,021.07, and liabilities aggregating $2,370,264.62. As the Club was unable to meet its debts as they matured, in July of 1934 it filed proceedings in the District Court of the United States for the Northern District of Illinois, seeking to be reorganized under section 77B of the Bankruptcy Act. In its petition it recited that the lessors under the ground leases were amenable to amending such leases, agreeing to reduction in ground rent, provided that the Club could raise certain funds from contributors to meet delinquent taxes and otherwise satisfactorily recapitalize its debt structure. By orders of the court the Club was permitted to remain *216 in possession of its property and operate it, which it did, uninterruptedly during and after the reorganization. In 1937, all provisions of the plan of reorganization having been complied with, the reorganization proceedings were terminated. Under the plan the old first mortgage leasehold bonds became and were exchangeable for new 15-year income leasehold bonds, with interest payable at variable rates dependent on the Club income available; and the old second mortgage leasehold bonds became and were exchangeable for new certificates of indebtedness due and payable without interest in 1949. As part of the plan, it was provided that the certificates of indebtedness would be retired, to the extent possible, out of monies left after payment of operating expenses of the Club, including ground rentals, taxes, and the amounts allocable to the purchase of the new first mortgage bonds and interest thereon, and for sinking-fund requirements. A sum slightly in excess of $81,000 was necessary to meet these obligations. In only one year, that ending March 31, 1944, was the income of the Club sufficient to permit the retirement of any certificates of indebtedness. The Club operated at a loss during *217 the fiscal years ended March 31, 1933, 1934, and 1935; but thereafter, for every year, it operated at a profit. Its fixed assets, as well as the club equity (excess of assets over liabilities), remained substantially the same from 1934 to 1946, according to the Club's books. The club equity exceeded $750,000. There were no bid and asked quotations on second mortgage bonds or on the certificates of indebtedness at any time from 1934 to 1946. From 1938 to 1943 holders of about $65,000 worth of these certificates sold them at a rate of $2 per thousand. During 1944 the Club purchased on tenders pursuant to the terms of the plan of reorganization $194,500 par value of such certificates at a total cost of $4,064.34, including those owned by petitioners herein. Each petitioner claimed a deduction on his 1944 tax return of a long-term capital loss of 50 per cent, based upon the difference between the amount received on the sale of the certificates and the face amount of the certificates. In the statement attached to each notice of deficiency, respondent determined: "The deduction * * * claimed from gross income on your 1944 income tax return, representing 50% of a loss * * * alleged *218 to have been sustained from the sale of certificates of indebtedness of The Standard Club, has been disallowed for the reason that it has been determined that the basis of the certificates in your hands was zero, and that they were worthless prior to the year 1944. * * *" [Opinion] We need not long be detained by the first issue, for respondent recognizes that if we follow , affirming , and , affirming a Tax Court Memorandum Opinion [, that issue must be decided adversely to him. Although respondent urges, without advancing any new arguments, that those cases were wrongly decided, we believe otherwise and shall continue to follow them in these proceedings. The principal area of difference between the parties then becomes whether the certificates of indebtedness which petitioners sold in 1944 had no basis for purposes of determining gain or loss, as respondent argues; or whether they retained the basis of the cost of the second mortgage bonds, which were exchanged in 1937 for the *219 certificates, as petitioners urge. It is respondent's contention that in 1934 the second mortgage bonds became worthless when the Club filed its petition in bankruptcy, and that the certificates given in exchange therefor in 1937 were also worthless; and, therefore, they had no basis in the hands of petitioners. He argues that by the harsh terms of the lease amendments, later incorporated in the plan of reorganization, the lien of the second mortgage bondholders was extinguished, and they had no present equity. The securities had no prospective value, he maintains, because the Club income had to reach a virtually unattainable level before any portion thereof would be available for retirement of the certificates pursuant to the terms of the reorganization plan. In this argument, it is to be observed that respondent disregards the factor that any certificates not purchased or retired prior to August, 1949, were "to be and become the general obligation" of the Club. Moreover, he minimizes the book value and reproduction value of the Club's principal assets as elements in determining the question of the worthlessness of the securities. Petitioners, on the other hand, have stressed *220 the facts that according to the Club's balance sheets its assets exceeded liabilities at all times material by over 3/4 of a million dollars, and that even if the building were to be valued at reproduction cost, after ordinary age depreciation, there was still an equity in the holders of the second mortgage leasehold bonds of approximately 70 cents on the dollar. Additionally, they assert that the Club at all times was a going concern and earned substantial profits every year from March 31, 1935, to March 31, 1947. Viewing the matter with practical and realistic objectiveness, cf. , we believe that petitioners have made a prima facie showing that the second mortgage bonds were not worthless in 1934, and that the certificates of indebtedness were not worthless upon receipt or at any other time prior to their sale in 1944, and such showing we deem sufficient to shift the burden of going forward to respondent. . The test generally applied in situations where the question of worthlessness of securities is involved was stated in , affd. (CCA-7), *221 : "The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some 'identifiable event' in the corporation's life which puts an end to such hope and expectation." See, e.g., ; ; , affd. (CCA-3), . The application of this test to the facts before us gives support to *222 petitioners' views. As in the Edwards case, there were here produced balance sheets of the corporation, as well as other stipulated facts bearing upon the value of its principal assets, which we can, in the absence of any different showing, utilize in resolving the question of worthlessness that is presented. Cf. . These data reflect that assets substantially exceeded liabilities, and permit the conclusion that the second mortgage bonds were not only not worthless in 1934, but that there was a present liquidating, as well as potential, value; and, likewise, the conclusion that the certificates procured in 1937 were not worthless upon receipt. It is facts such as these which distinguish the present proceeding from ; certiorari denied, , cited by respondent. It was there found that liabilities exceeded assets by a substantial sum and the other attendant circumstances were such as to justify the ascertainment of worthlessness by the taxpayer, the statutory test then applicable. The reorganization of the Club under section 77B *223 of the Bankruptcy Act, the strongest single element upon which respondent can rely, is not of itself sufficient to establish worthlessness. ; . This is particularly so where, as here, there is continuing profitable operation of the venture; cf. et seq., affirming CCA-3, ; the retention of the principal assets which induced and secured petitioners' original investment in the enterprise, cf. ; and a reduction in the fixed charges making possible the continued use of the assets securing petitioners' investment. It may further be observed that if petitioners had sought to claim that their bonds were worthless in 1934, respondent might well have argued that they were not, and that the deductions should have been disallowed. Cf. , affd. (CCA-3), . It is our conclusion that petitioners in these proceedings have made a prima facie showing sufficient to overcome *224 the presumptive correctness of respondent's determination. ; cf. , with , and . No significant contrary evidence having been adduced, respondent's determination is disapproved. Decisions will be entered under Rule 50.